Complainant has filed a bill against her husband the defendant asking that this court compel the defendant to reconvey to her premises situate in Millville, New Jersey, and for other relief with reference to stock in the Anderson Memorial Works, Incorporated, and a certain promissory note in connection therewith, as against not only the defendant husband, but also against other defendants named in the bill of complaint. A decreepro confesso has been entered as against all of the defendants named in the bill of complaint, with the exception of Albert L. Johnson, complainant's husband.
The facts as disclosed by the evidence are that the complainant was married to the defendant on April 3d 1929, she, at that time, being the widow of one Claude W. Anderson, who had died approximately two years prior to the union between complainant and defendant. Prior to the death of Anderson, he had executed a will in which he devised and bequeathed all of his estate to his widow, and she came into possession of real estate in Millville of quite some value, as well as $2,000 in life insurance, and her deceased husband's business, which consisted of a stock of granite, marble and finished monuments and other articles of that nature, together with tools of trade, good will, c., in the monument memorial business which had been conducted by her deceased husband for many years and which had been founded by his father back in 1895. After the death of complainant's first husband, the monument business was conducted by her, largely through the skill and ability of her brother, Oscar Schick, and the business was being conducted by her in that manner quite successfully at the time of the marriage between complainant and defendant. *Page 33 
Prior to the wedding ceremony the defendant was employed as a trolley motorman or conductor in Philadelphia and had no assets other than his weekly wage. A short time before the marriage the defendant moved to Millville and accepted employment in a tannery at a weekly wage of $22 and after complainant and defendant became engaged, she having consulted with her brother, offered employment to defendant in the monument works, at a salary of $25 per week, which offer the defendant accepted and worked for complainant approximately a month before the marriage.
On April 3d 1929, the marriage ceremony having been performed, complainant and defendant honeymooned at Niagara Falls and returned to Millville in about one week, and on the 22d of April, 1929, nineteen days after the wedding ceremony, complainant conveyed, through an intermediary, to the defendant, all of her real estate, the result of the conveyance being that complainant and defendant were seized thereof as tenants by the entirety. On this real estate there were erected buildings used, in part, for business purposes in connection with the monument works, and the residence in which complainant and defendant dwelt.
Subsequently, on or about the 7th day of May, 1929, a little over a month after the marriage ceremony, complainant attached her signature to a certificate of incorporation of the Anderson Memorial Works, Incorporated, in which certificate it was provided that the aggregate capital should be $9,200, with stock to be issued of the par value of $50, of which stock the defendant, Johnson, complainant's husband, was to have ninety-one shares, complainant one share, Oscar Schick, her brother, ninety-one shares, and Pauline S. Schick, the wife of Oscar and the sister of defendant, one share. In pursuance of the announced purpose of the certificate of incorporation, complainant, on the 6th day of June, 1929, executed and delivered the necessary instruments to transfer to the corporation a one-half interest in the business, theretofore her own property and conducted by her under the name of C.W. Anderson Marble Works, including not only the tools and outstanding accounts, but also money on deposit in bank, *Page 34 
and at the same time she transferred the other one-half interest in the marble works of her brother, Oscar Schick, and her brother and complainant then transferred to the new corporation all of the stock, fixtures, good will, c., of the monument business formerly conducted by complainant, to the new corporation, and by so doing, complainant divested herself completely of any property or interest in the business which she had inherited from her husband and which she and her brother had theretofore conducted.
At the time of the organization meeting of the new corporation, Oscar Schick received his stock allotment of ninety-one shares, Mrs. Schick her one share, the complainant her one share and the defendant his ninety-one shares.
It had been agreed between the complainant and her brother that she would give him a one-half interest in the monument business, and her reason for so doing was apparently a good one, because it appears that he was a journeyman stone cutter and a monument worker and erector, and that had she not agreed to give him the one-half interest in the business, he would have ceased his connection with that business and probably started an opposition works, which would have been disastrous to complainant. Mr. Schick, however, refused to accept the one-half interest as a gift from complainant, his sister, but insisted that he should pay therefor $4,600, which was agreed upon as being a fair price for the one-half interest. From this it would have naturally followed that at the organization meeting when the stock was delivered to Schick and he gave in payment therefor the promissory note in the sum of $4,600, that that note would have been made payable to complainant and that the ninety-one shares of stock in the name of Schick would have been assigned to complainant as collateral security for the payment of the note, but that is not what happened. The note was made payable to the defendant Johnson.
So that, in the period between April 3d 1929, and June 7th, 1929, Mr. Johnson, defendant, was in possession of everything his wife owned, including real estate and the business formerly conducted by her deceased husband, with the exception *Page 35 
of $2,000, which she had realized on her deceased husband's life insurance, and it is to obtain relief from this situation that complainant has filed her bill of complaint.
Mr. Johnson says in his answer that all of these gifts from his wife to himself were made at her own suggestion, without any inducement on his part and with full knowledge on her part of the effect of her gifts, and with full opportunity to be independently advised, and with independent advice.
There can be no doubt as to the law applicable to the facts as adduced by the evidence in this case.
In Farmer's Executor v. Farmer, 39 N.J. Eq. 211 (at p.215), Vice-Chancellor Van Fleet said:
"A wife may bestow her property by gift on her husband, or she may make a contract with him which will be upheld in equity, but such transactions are always examined by courts of equity with an anxious watchfulness and caution, and dread of undue influence."
In the same case the vice-chancellor (at p. 216), said:
"Gifts by a wife to her husband, says Chancellor Kent, are to be closely inspected on account of the danger of improper influence, but if they appear to have been fairly made, and to be free from coercion and undue influence, they ought to be sustained. Bradish v. Gibbs, 3 Johns. Ch. 523. The reason of the rule is manifest. The confidence of the marriage relation is so complete, and the trust of the wife in the honor, good faith and love of her husband is generally so perfect, and in all business affairs she depends upon him, and suffers herself to be controlled by his judgment. Unless, therefore, the court, in the language of Lord Eldon watches transactions between parties thus situated, where fraud may be committed with such facility and its discovery may be so easily baffled, with a jealousy almost invincible, it will oftener lend its assistance to fraud than punish the fraud-doer. Hatch v. Hatch, 9 Ves. 292."
And further, on the same page, the learned vice-chancellor said that the most accurate and comprehensive statement of the general principle with reference to such contracts was that given by Judge Hand in Cowee v. Cornell, 75 N.Y. 91: *Page 36 
"It may be stated as universally true that fraud vitiates all contracts, but as a general thing it is not to be presumed, but must be proved. Whenever, however, the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that either on the one side, from superior knowledge of the matter derived from a fiduciary relation, or from overmastering influence, or, on the other, from weakness, dependence or trust justifiably reposed, unfair advantage in a transition is rendered probable, then the burden is shifted, the transaction is presumed void, and it is incumbent on the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood."
An examination of the transactions between complainant and defendant, made with "anxious watchfulness and caution, and dread of undue influence" leads me to the conclusion that Mr. Johnson, the defendant has not sustained the burden of proof which the law casts upon him in this case.
I find the true facts to be that when the conveyance was made of the real estate it was at Mr. Johnson's suggestion and not at Mrs. Johnson's suggestion. She says that on their return from their honeymoon Mr. Johnson asked her for her title papers and that in pursuance with his request she got them from her safe deposit box and gave them to him, and that he requested her to ascertain whether Mr. Sheldon, the conveyancer, could see him, Mr. Johnson, on the following day, and she says that Mr. Johnson took the title papers to Mr. Sheldon on the following day, she not being present, and that thereafter, in pursuance of a request from her husband, she went to the office of Mr. Sheldon and executed the necessary papers to transfer the title, so that her husband would become a tenant with her by the entirety. She says, and I believe her, that no one advised her as to the purport of her act. I do not mean by this that Mr. Sheldon in any way attempted to conceal from her that which she was doing, but I do mean to say that which she did was done under the influence of her husband's suggestion and that it would *Page 37 
not have been done had the wife been properly advised. If this transaction stood alone, a court of conscience might possibly hold that the prayer of the complainant that there be a reconveyance be denied but viewing this transaction with those which subsequently happened, the mind cannot come to any other conclusion but that Johnson worked quickly after his marriage, his wife being under the spell of her new found love and affection for a husband she was then trusting.
Johnson, not satisfied with having procured the conveyance of the real estate, took advantage of the situation that existed between the complainant and her brother, Oscar Schick, with reference to the business, and this is demonstrated by what subsequently happened, to wit:
Mr. Schick, having become aware of the real estate transaction between his sister and the defendant, quit the business entirely and announced to his sister, in the presence of Johnson, her husband, that he demanded to know where he stood, and was quitting the business until a complete understanding was had. The result of this stand on the part of the only person upon whom the complainant could depend for the continuance of the business was that on that evening a conference was had at the home of Mr. Schick in the presence of the defendant and complainant and the wife of Mr. Schick. Mrs. Johnson offered to give her brother a one-third interest in the business. This he refused. She finally offered to give him a half interest in the business and this he refused, saying that he would not accept a half interest in the business as a gift but that he would pay for it. The result was that Mrs. Johnson agreed to sell one-half interest in the business to her brother, and at this point, Mr. Johnson evidently saw his opportunity, because he and Mr. Schick then arranged what amounted to a partnership agreement as between the defendant and Schick, and the business was operated for a very short time as a partnership between Schick and Johnson, but during that time the complainant had not transferred to Johnson any interest in the business. He had simply appropriated a one-half interest. Johnson, realizing his situation, then suggested to Schick the formation of a corporation *Page 38 
and in that manner made it possible for him to have Mrs. Johnson transfer to him the one-half interest in the business which, prior to the incorporation, he did not have. If Johnson had been satisfied to merely take the ninety-one shares of capital stock which were issued in his name, his greed would not have been quite so apparent, and yet sufficiently apparent to justify a decree against him, but in addition to taking the ninety-one shares of stock he actually had the temerity to have the note signed by Schick in payment of his ninety-one shares of the stock made out in his, Johnson's, name, instead of in the name of his wife.
Johnson having accomplished his purpose at the organization meeting of the corporation, took all the certificates of stock, bills of sale, certificate of incorporation, c., into his own possession, and at the time of the final hearing produced all of these papers, as well as the title papers to the real estate, and his possession of these papers, under the circumstances of possession, as related by him, is one of the strongest indications of his cupidity in the entire case, for the following reasons:
When Johnson got his wife to convey the real estate he had her get the title papers from her safe deposit box. At that time he had no safe deposit box and it is admitted that he had nothing to put in a box, but after the conveyance, Johnson rented a box and put these title papers in it, he said because they were kicking around the house and his wife would not put them in her own box because it was crowded. I do not believe it. However, he then rented a box and the corporation also rented one, and the natural place to have put the corporation papers would have been in the corporate box, but Johnson did not do this; he put them in his own, to which he alone had the key. Of course, he did not accomplish a great deal by so doing, but he did, by so doing, indicate his desire to strip his wife of all her possessions.
What has been said before would seem to be sufficient to demonstrate the reason for the court's findings, but another incident may not be amiss.
Johnson says he does not understand just why it was that *Page 39 
the note given by Schick in payment of his ninety-one shares of stock was made payable to Johnson, in fact, he is quite much surprised that it was so drawn, and yet, since the making of that note, Schick has paid two installments of interest to Johnson and Johnson has kept the interest payments. He admits that he has kept these interest payments but says that he expended the moneys so received for the benefit of his wife, by small presents and taking her on a trip. By making these expenditures, if he did make them, and buying presents for his wife and taking her on a trip, he may have further endeared himself to her, but he was very careful not to explain to her that his generosity found its source from her interest money.
Being satisfied, as I am, that Mr. Johnson has stripped his wife of her property, real and personal, through the advantage gained by his position as her husband, I will advise a decree in favor of the complainant, the terms of which may be settled on notice in the event that counsel are unable to agree thereon.